**UNITED STATES OF AMERICA,**

                 **Plaintiff,**

-v-

**AMON SMITH,**

                 **Defendant.**

**Case No. 3:11-cr-133**

**Judge Thomas M. Rose**

---

**ENTRY AND ORDER OVERRULING SMITH'S MOTION TO SUPPRESS (Doc. #24) AND GRANTING IN PART AND OVERRULING IN PART SMITH'S SUPPLEMENTAL MOTION TO SUPPRESS (Doc. #27)**

---

On August 24, 2011, a federal Grand Jury returned a two-count Indictment charging Defendant Amon Smith ("Smith") with conspiracy to distribute illegal drugs and attempt to possess illegal drugs. On October 12, 2011, Smith filed a Motion To Suppress any and all evidence obtained from the warrantless search and seizure of his home and business in Ohio and any and all statements which he may have made. (Doc. #24.) On October 27, 2011, Smith filed a Supplemental Motion To Suppress evidence obtained from the August 17, 2010 search of a vehicle in which he was riding in Oklahoma City, Oklahoma. (Doc. #27.)

Smith argues that the Government did not obtain a knowing and voluntary Miranda waiver when he was interrogated in Ohio and that he was illegally coerced into agreeing to a search of his home and business. In his Supplemental Motion To Suppress, Smith argues that the Government had no lawful cause to stop the vehicle in which he was riding in Oklahoma, that the Government did not have good cause to search the vehicle, that the search of the vehicle was illegal and that the seizure of his phone was illegal.

An evidentiary hearing on Smith's Motion To Suppress was conducted on November 14, 2011. (Doc. #28.) An evidentiary hearing on Smith's Motion To Suppress and Supplemental Motion To Suppress was conducted on January 6, 2012. (Doc. #31.) The Jury Trial of this matter is set for May 14, 2012.

Following the hearings, Smith filed a Memorandum In Support of his Motions To Suppress. (Doc. #34.) The Government has responded (doc. #37) and Smith has replied (doc. #40). Therefore, Smith's Motions To Suppress are ripe for decision.

Findings of relevant facts will first be set forth. This will be followed by the relevant legal provisions and an analysis of Smith's Motion To Suppress.

## FINDINGS OF RELEVANT FACTS

### Ohio

After a two year investigation into Smith's alleged drug trafficking activities, the DEA arrested him on March 24, 2011, when he attempted to purchase approximately 800 pounds of marijuana from an undercover agent. (11/14/11 Transcript 7-8.) Smith was taken to the nearby DEA office where he was processed and then interviewed by Special Agent Randall Terry ("SA Terry") and Task Force Officer Bill Toney ("TFO Toney"). (Id. at 8-12.) During the interview, both SA Terry and TFO Toney were in plain clothes, no weapons were in the room, Smith was not handcuffed and all parties remained seated. (Id. at 9-13.)

The twenty minute interview began at approximately 1:20 p.m. SA Terry introduced himself and TFO Toney and presented Smith with a Miranda Warning/Advise of Rights form identified as DEA Form 13. (Id. at 13, 15.) The form contained areas with pre-printed information that included a defendant's constitutional rights, as well as blank areas for certain

information such as the defendant's name, the date, the time and signature lines for the individual administering the Miranda warnings. (Id. at 15-20.) Handwritten notes on the form presented to and completed by Smith indicated that SA Terry began reading the form to Smith at 1:20 p.m. and Smith completed his acknowledgments at 1:40 p.m. (Id. at 15-18.) The form indicates that Smith understood and waived his Miranda rights. (Id. at 20-22.)

There was a twenty-minute time period between when the form was initially presented to Smith and when he signed. (Id. at 22.) During this twenty-minute period, Smith had questions for SA Terry and TSO Toney. (Id.) Smith indicated that he did not understand why he had been arrested and that he did not do anything wrong. (Id.)

In response, SA Terry described some of the details of the two-year investigation of Smith including some of the evidence that had been gathered during that time. (Id.) SA Terry also explained the potential federal charges that Smith was facing as a result of the investigation and the possible benefits of cooperating. (Id. at 23-24.)

SA Terry then asked Smith if he would cooperate and Smith responded that he could not. (Id. at 26-27.) Smith's refusal was followed by a brief period of silence and inaction by Smith who neither signed nor refused to sign the waiver. (Id.)

SA Terry inquired if Smith was not cooperating because he did not want to or because he did not have any information to provide. (Id. at 27.) Smith's only response was that he wanted to call his wife. (Id. at 28.) That request was not honored at the time because an investigation was ongoing. (Id.)

Smith was also informed at that time, that SA Terry was in the process of attempting to obtain a federal search warrant for Smith's residence and his business. (Id.) In response, Smith

indicated that he was concerned about the safety of his wife and children during the execution of a search warrant. (Id. at 29.) SA Terry informed Smith that everything possible would be done to make sure that everybody was safe if the search warrant was executed.

SA Terry suggested that a search warrant could be avoided if Smith consented to the search. (Id. at 30.) Smith agreed and signed the consent to search forms for his business and residence and the waiver of rights form that had remained in front of him during the interview. (Id. at 30-32.)

After the forms were signed, search warrant teams were dispatched to the locations while the interview continued. (Id. at 39-40.) Smith continued to provide what was considered by SA Terry and TFO Toney to be untruthful information and eventually the interview was ended approximately ten minutes later by Smith stating, "I guess there's nothing more to say." (Id. at 44-48.)

## Oklahoma

At approximately 8:30 a.m. on August 17, 2010, Agent Diaz of the Oklahoma Bureau of Narcotics was traveling eastbound on Interstate 40 in Oklahoma City, Oklahoma. (01/06/12 Transcript 5, 12-13.) He entered the median near mile marker 114 and noticed three cars traveling westbound. (Id. at 13.)

He followed them and caught up with the car Smith was riding in, a rented Chrysler 300. (Id. at 14-15.) The Chrysler 300 was occupied by three individuals who were later identified as Katlin Robinson, the driver, Anthony Edwards, the front seat passenger, and Smith, the backseat passenger who lay prone behind the driver. (Id.) While he was following the Chrysler 300, Agent Diaz ran the license plates and found that the vehicle was rented. (Id. at 14.)

As he passed by on the driver's side of the Chrysler 300, Agent Diaz peered into the vehicle to check for seatbelt violations and found none. (Id. at 15.) Agent Diaz, however, noticed what he thought was "out of the norm" behavior by the three occupants. (Id. at 15-17.) Smith popped his head up from his prone position in the back seat and quickly glanced at Agent Diaz. The other two occupants of the Chrysler followed suit. (Id.) The manner in which the occupants quickly glanced at Agent Diaz and then looked straight ahead was not normal to Agent Diaz. (Id. at 17.)

Agent Diaz observed the driver of the Chrysler 300 following the car in front of her too closely. (Id.) So he fell in behind and activated his emergency lights to conduct a traffic stop. (Id.) As she was pulling to the side of the road, Agent Diaz also observed her unsafely changing lanes. (Id. at 23.)

Agent Diaz exited his cruiser and approached the driver from the passenger side of the Chrysler 300. (Id. at 23.) As Agent Diaz approached the Chrysler 300, Smith first remained prone in the backseat with his head leaning against the driver-side rear door and the front seat passenger slumped down into his seat, both as if to feign sleep. (Id. at 24-28.) Yet, there were no other outward signs that they had been sleeping prior to the stop. (Id. at 26-28.)

Agent Diaz's suspicions were confirmed when he noticed the odor of marijuana emanating from the Chrysler 300. (Id. at 25.) Yet, based upon consideration for his personal safety, Agent Diaz elected to not mention the marijuana odor to the occupants because he was alone at the time. (Id.) At that time, however, based upon the strange behavior and the marijuana odor, Agent Diaz felt that he had probable cause to search the vehicle. (Id. at 31.)

Agent Diaz greeted the occupants and explained the reason for the stop. (Id. at 29.) The

driver of the vehicle admitted to Agent Diaz that she had been following too close and indicated that she was usually more careful. (Id. at 38.)

Agent Diaz also asked the driver of the Chrysler 300 to produce her driver's license. Instead of doing so, the driver fumbled in her purse and glanced back and mumbled something to Smith. (Id. At 29.) As she continued to look for her driver's license, Agent Diaz directed her to exit the vehicle and go to his cruiser. (Id. at 29-31.) Though the front passenger asked to also exit the vehicle, Agent Diaz refused as Agent Diaz was alone and remained concerned about his safety. (Id.)

The driver never was able to produce a valid driver's license though she insisted that she had one. (Id. at 34-35.) So, Agent Diaz called her personal information into dispatch. (Id. at 35, 40-41.)

While waiting for dispatch, Agent Diaz told the driver that he would issue a warning and let the occupants be on their way. (Id. at 45-46.) While waiting on dispatch, Agent Diaz decided to approach the other two occupants of the Chrylser 300. (Id. at 46-47.) He decided to approach the other two occupants to speak with them further about their travel plans, to determine ownership of the vehicle, to obtain the rental agreement and to ensure that at least one of them had a valid driver's license. (Id. at 46-47.)

Agent Diaz approached the front seat passenger first, who produced a driver's license that appeared to be valid. (Id. at 48.) Also, Smith produced a rental agreement showing that he (Smith) had rented the Chrysler 300 in his name. (Id.) Though both described the same travel plans to visit Smith's aunt, neither knew the address and the front seat passenger did not know the aunt's name or how long they would be visiting. (Id. at 49-51.) Also, Smith gave an incorrect

name for the individual that was driving the Chrysler 300. (Id. at 53.)

Agent Diaz then returned to his cruiser. (Id. at 52.) Dispatch finally returned with confirmation that the driver's license was invalid. (Id.) Thus, Agent Diaz issued a citation to the driver for operating the vehicle under an invalid license. (Id. at 53-55.) He also issued a warning for following too close. (Id.) In total, it took approximately twenty minutes from the beginning of the stop until completion of the citations. (Id. at 54-58.)

After giving the citations, Agent Diaz returned all of the driver's "things" to her and told her he was finished. (Id. at 61.) He, however, still had intentions at that time to search the vehicle so he engaged the driver in further conversation. (Id.) The driver agreed to the further conversation. (Id. at 65.)

Agent Diaz confronted the driver about the marijuana odor. (Id.) In response, she admitted that "they" had smoked marijuana but not in the car. (Id. at 62-63.) He then asked her whether they were transporting specific drugs or large quantities of currency in the Chrysler 300. (Id. at 64.) The driver said "no." (Id.) Agent Diaz then asked the driver for permission to search the Chrysler 300 and to talk to the other two passengers. (Id. at 64-66.)

Agent Diaz then asked Smith to exit the vehicle which he did. (Id. at 66-67.) Agent Diaz first confronted Smith with the fact that he (Agent Diaz) had detected the marijuana odor. (Id.) Smith neither acknowledged nor denied this assertion other than to say there was no marijuana in the car. (Id. at 68.) Agent Diaz then posed the same questions regarding illegal substances and currency to Smith. (Id.) Finally, Agent Diaz asked for and Smith granted permission to search the Chrysler 300. (Id. at 68-69.)

Agent Diaz and another officer, who had arrived on the scene at Agent Diaz's request,

searched the Chrysler 300. (Id. at 69-70, 74-75.) After approximately thirty minutes, they discovered approximately $75,000 secreted in the spare tire of the vehicle. (Id.)

Though no one was under arrest at the time, Agent Diaz mirandized all three of the occupants and questioned them about the currency that had been discovered. (Id. 76-77.) Each denied any knowledge of the currency. (Id.)

## RELEVANT LEGAL PROVISIONS

### <u>Miranda Rights</u>

The Miranda doctrine provides that the Government may not use statements made by a defendant and stemming from a custodial interrogation of the defendant unless the Government demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "Prior to any questioning, the [defendant] must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Id.* The government has the initial burden to show waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

The defendant may waive these rights "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. The question of waiver is determined on "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979).

An express waiver is usually strong proof of the validity of that waiver, but is not either necessary or sufficient to establish waiver. *Id.* at 373. However, the waiver need not be express but can be implied to have occurred by the totality of the circumstances. *Moran v. Burbine*, 475

U.S. 412, 421 (1986). Further, when a suspect does not clearly invoke his right to remain silent or when the invocation is ambiguous, officers may follow up with clarifying questions. *Davis v. United States*, 512 U.S. 452, 461-62 (1994).

A relinquishment of Miranda rights must be "the product of a free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Also, any relinquishment of Miranda rights must have been made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

Courts look to the "totality of the circumstances" surrounding the interrogation to determine if Miranda rights have been waived. If the defendant indicates in any manner that he or she wants to consult with an attorney, there can be no further questioning. *Miranda*, 384 U.S. at 444-45. Likewise, if the individual indicates in any manner that he or she does not wish to be interrogated, questioning may not proceed. *Id.* at 445. Once a person in custody exercises his or her right to remain silent, law enforcement must "scrupulously honor" this choice. *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). However, "[i]f an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her Miranda rights." *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259-60 (2010)(quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)).

### Involuntary Statements

The Fourteenth Amendment is breached when an involuntary confession is obtained and introduced into evidence in a criminal prosecution which culminates in a conviction. *Blackburn v. State of Alabama*, 361 U.S. 199, 205 (1960). The coercion used to obtain an involuntary

confession can be both mental and/or physical. *Id.* at 206. When determining the voluntariness of a confession, the court must examine "the totality of the circumstances surrounding the confession, both the characteristics of the accused and the details of the interrogation, and determine their psychological impact on an accused's ability to resist pressures to confess. *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir. 1991)(quoting *United States v. Brown,* 557 F.2d 541, 546 (6th Cir. 1977)). To support a determination that a confession was coerced, the evidence must show that: (1) the police activity was objectively coercive; (2) the coercion was sufficient to overbear the defendant's will; and (3) the defendant's will was, in fact, overborne. *Id.* Finally, voluntary statements that appear to be exculpatory when made, may later become incriminating. *Wong Sun v. United States*, 371 U.S. 471, 487 (1963).

## Stop and Search of Vehicle

The Fourth Amendment forbids unreasonable searches and seizures. *Whren v. U.S.*, 517 U.S. 806, 809 (1996). The temporary stop of an automobile by police is a seizure as described in the Fourth Amendment. *Id.* Therefore, the stop of an automobile must be supported by probable cause. *United States v. Ross*, 456 U.S. 798, 823 (1982); *Maryland v. Pringle*, 540 U.S. 366, 369 (2003).

Probable cause is reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion. *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006). Probable cause exists when there is a fair probability that evidence of a crime will be located on the premises of the proposed search. *Id.* Thus, when determining the admissibility of evidence seized during a warrantless search of a vehicle, the court must determine (1) whether the initial stop was supported by reasonable suspicion, and (2) whether the subsequent search of the

vehicle was supported by probable cause. *United States v. Foster*, 376 F.3d 577, 584-85 (6th Cir. 2004); *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993). Finally, the Sixth Circuit has consistently held that a detection of the smell of marijuana in an automobile can, by itself, establish probable cause for a search of the automobile. *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002)(citing *Garza*, 10 F.3d at 1246).

Reasonable suspicion, or probable cause, must be based upon a particularized and objective basis for suspecting the particular person of criminal activity. *U.S. v. Cortez*, 449 U.S. 411, 417-18 (1981). When assessing reasonable suspicion, courts are to consider all of the officer's observations and not discard those that may seem insignificant or troubling when viewed alone. *U.S. v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002). A totality-of-the-circumstances approach is used which "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them…" *Id.*

### Consent To Search

Asking a detained motorist for consent to search the vehicle does not turn a lawful traffic stop into an unreasonable traffic stop. *Ohio v. Robinette*, 519 U.S. 33, 39 (1966). The Fourth Amendment is not violated when a detained motorist is asked extraneous questions so long as those questions do not unnecessarily prolong the detention and the detainee's responses are voluntary and not coerced. *United States v. Aguilera-Pena*, 426 F. App'x 368, 370 (6th Cir. 2011); *United States v. Burton*, 334 F.3d 514, 518-19 (6th Cir. 2003).

Further, the Fourth and Fourteenth Amendments require that a consent to search not be coerced. *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). A coerced consent would be

nothing more than a pretext for unjustified police intrusion. *Id.*

Finally, an officer's search cannot exceed the scope of a suspect's consent. *United States v. Gant*, 112 F.3d 239, 242 (6th Cir. 1997)(citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). After an officer states his belief that narcotics are in a vehicle, a suspect's general consent extends to all containers in the vehicle that could reasonably contain the narcotics. *Jimeno*, 500 U.S. at 251.

## ANALYSIS

## <u>Ohio</u>

Smith seeks to suppress all evidence obtained from the warrantless search and seizure of his home and business. He also seeks to suppress any and all statements he made because they were obtained in violation of his Miranda rights. The Government has met its burden on both arguments.

First, Smith was fully apprised of his Miranda rights, both verbally and in writing. Following Smith's arrest, SA Terry went over the waiver form with Smith, both reading the information and requiring Smith to verbally confirm his understanding of the information. After twenty minutes of discussion, he indicated that he understood those rights and elected to waive them. Thus, Smith knowingly, voluntarily and intelligently waived his Miranda rights.

Approximately twenty minutes elapsed between when the waiver form was presented to Smith and when he signed it. During this twenty minutes, Smith did not indicate that he would not waive his rights and mere silence does not invoke Miranda rights.

Smith had inquired as to why he was arrested. During the twenty minutes, SA Terry identified the existing evidence against Smith and discussed the potential federal charges that

Smith faced. SA Terry also indicated that the Government was seeking a search warrant for Smith's home and business and discussed how the warrant would be executed. In response, Smith expressed concern about the safety of his family and decided to both waive his Miranda rights and consent to a search of his home and business to avoid the execution of a search warrant.

Smith also argues that he was coerced into consenting to the search of his home and business because the Government threatened his family and property. However, it was Smith who raised the issue of the safety of his family and the destruction of his property.

The Government indicated that it would be obtaining a search warrant and Smith raised concerns about how the search warrant would be executed. He was assured that all precautions would be taken to ensure everyone's safety, but he elected to consent to the searches anyway. Thus, his consent to search was not coerced.

### Oklahoma

Smith first argues that Agent Diaz did not have probable cause to stop the Chrysler 300. Smith also argues that Agent Diaz created the probable cause.

Agent Diaz observed that the driver of the Chrysler 300 was following the vehicle in front too closely in violation of Oklahoma traffic law. This was also acknowledged by the driver of the Chrysler 300 and confirmed by video evidence. Further, there is no evidence that Agent Diaz prevented the driver of the Chrysler 300 from following the vehicle in front at a safe distance and there is no evidence that Agent Diaz made the driver of the Chrysler 300 follow the vehicle in front too closely. Thus, Agent Diaz had probable cause to stop the Chrysler 300, an observed traffic violation.

Smith next argues that there was no odor of marijuana. The basis for this argument is that, according to Smith, it made no sense for Agent Diaz to "spend 35 minutes snooping around with the three occupants of the car and then finally calling for backup to assist with a search."

Agent Diaz testified that there was an odor of marijuana coming from inside the Chrysler 300. Also, the driver of the Chrysler 300 said that "they" had smoked marijuana at some point prior.

Agent Diaz explained that he did not immediately investigate the marijuana because he was concerned about his own safety and about issuing the traffic violation. He eventually called for backup "toward the end of the contact" to assist with the search.

The odor of marijuana is enough to give Agent Diaz probable cause to search the Chrysler 300. The Government has presented reliable evidence that there was an odor of marijuana coming from the Chrysler 300 and Smith has not identified evidence to the contrary.

Smith's next argument is that "consent that is obtained outside of an initially lawful detention is the product of an illegal detention, and therefore invalid." Smith argues that he did not consent, that Agent Diaz's staccato questioning technique is not capable of obtaining valid, knowing and intelligent consent under the circumstances, and that taking a knife to cut open a spare tire is beyond the scope of consent any reasonable person would understand from the circumstances present in this case.

The Government has shown that Smith consented to the search of the Chrysler 300. Further, although the traffic stop may have been extended due to Agent Diaz's additional questioning, the responses to the additional questions were voluntary and not coerced.

Next, Smith offers no reason, legal or otherwise, why Agent Diaz's "staccato questioning

technique" is not capable of obtaining a valid, knowledgeable and intelligent consent. Also, the Court is unable to find such a reason, legal or otherwise.

Next, Smith argues that Agent Diaz exceeded the scope of Smith's consent to search the Chrysler 300 when Agent Diaz used a knife to cut into the spare tire. However, Agent Diaz did not exceed the scope of the consent.

Agent Diaz informed Smith that he had detected a marijuana odor coming from the Chrysler 300 and asked about the presence of other illegal drugs and large quantities of currency. Thus, it was not unreasonable for Smith to expect that Agent Diaz would be searching for illegal drugs and large amounts of currency. The scope of the search was established. Finally, it was not unreasonable for Agent Diaz to search the spare tire since the spare tire could hold illegal drugs and/or large amounts of currency.

Smith's final argument is that he did not consent to the seizure of his phone associated with the Oklahoma traffic stop and that no warrant was obtained for the phone or the diagnostic testing thereof. The Government, who has the burden, offers no argument regarding Smith's phone. Therefore, evidence obtained from Smith's phone gotten as part of the Oklahoma traffic stop may not be used by the Government.

## CONCLUSION

Smith's Motion To Suppress (doc. #24) is OVERRULED. His Supplemental Motion To Suppress (doc. #27) is GRANTED IN PART and OVERRULED IN PART. Evidence obtained from Smith's phone obtained as part of the Oklahoma traffic stop may not be used by the Government. Other evidence obtained from the Oklahoma traffic stop may be used.

**DONE** and **ORDERED** in Dayton, Ohio this Eighteenth Day of April, 2012.

**s/Thomas M. Rose**
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record